WOODALL, Justice.
 

 Howard Ross appeals from a partial summary judgment awarding Shauli Ro-sen-Rager and Rene Rosen-Rager $13,343.47 in compensatory damages and from a judgment entered on a jury verdict awarding the Rosen-Ragers $350,000 in punitive damages in the Rosen-Ragers’ action against Ross and others alleging,
 
 *32
 
 among other things, trespass and ejectment. We affirm in part and affirm conditionally in part.
 

 I. Factual and Procedural Background
 

 On May 9, 2003, property owned by Margie Campbell in Huntsville was sold by the tax collector of Madison County for the collection of
 
 ad valorem
 
 taxes, which remained delinquent from the previous year. Ross, the winning bidder, paid $750 for the property, for which he received a “certifí-cate of land sold for taxes.” Ross purchased insurance on the property, paying a total of $1,178 in premiums. He also made improvements totaling $1,195.
 

 At the time Ross purchased the property, there was a mortgage on the property held by Mortgage Electronic Registration Systems, Inc. (“MERS”). Campbell defaulted on the debt secured by the mortgage, and, on July 3, 2003, MERS purchased the property at a foreclosure sale, for which it received a foreclosure deed. On September 28, 2004, MERS paid into the Madison County Probate Court $1,612.93 to redeem the property, pursuant to Ala.Code 1975, § 40-10-120
 
 et seq.
 
 The payment included Ross’s original tax-purchase price of $750, plus subsequent taxes paid by Ross, and interest calculated at 12%. In return, the probate court issued MERS a “certifícate of redemption,” pursuant to Ala.Code 1975, § 40-10-127. MERS’s payment did not include any amount for the insurance Ross had purchased or for the improvements he had made to the property.
 

 The certificate of redemption was duly recorded in the probate office, and, for all that appears, Ross was provided with notice of the issuance of the certificate of redemption as required by Ala.Code 1975, § 40-10-128, which provides:
 

 “If the lands redeemed were bid in by any person other than the state, the redemption money must be deposited by-the judge of probate in the county treasury and there kept separate and apart from the general funds of the county, and
 
 the judge of probate shall notify the purchaser of such deposit by mailing notice to the residence or place of business of such
 
 purchaser; or to such address as the purchaser may furnish the judge of probate at the time he secures his certificate of purchase; and, upon the demand of the purchaser, his legal representative or assignee and the surrender of the certifícate of purchase, the judge of probate must give him an order on the treasury for the same.”
 

 (Emphasis added.)
 

 Ross does not assert that he was
 
 not
 
 notified of the issuance of the certificate of redemption. In fact, on December 22, 2004, Ross caused to be recorded a “verified statement of a lien” on the property for “materials, repair, and improvements to the dwelling for the title holder of the property,” namely, MERS. Ross declined to collect the $1,612.93 that MERS had paid into the probate court.
 

 On February 7, 2005, Ross leased the property to Ron Fletcher, who went into possession. On May 13, 2005, MERS, incorrectly believing
 
 Campbell
 
 was residing on the property, filed in the Madison Circuit Court a “complaint for ejectment” against Campbell.
 
 MERS v. Campbell,
 
 CV-05-917. As soon as MERS learned the identity of Ross’s tenant, it amended its complaint to add Fletcher as a defendant. Still later, on December 9, 2005, MERS again amended its complaint to add Ross as a defendant.
 

 Meanwhile, on November 5, 2005, Ross sued Fletcher in the Madison District Court for unlawful detainer.
 
 Ross v. Fletcher,
 
 DV-05-2689. On December 14, 2005, the district court dismissed the action, stating: “[Ross] does not own clear
 
 *33
 
 title to the property that is the subject of this law suit, and therefore, has no standing to bring this action.”
 
 [1]
 

 MERS was unable to effect service of process on Ross. Its unserved civil summons was returned with the notation: “Avoiding Service.” In February 2006, however, Ross and MERS exchanged correspondence regarding payment for the insurance and improvements and about the ongoing litigation. For example, on February 4, 2006, Ross addressed the following letter to MERS’s attorney:
 

 “Re: Redemption of — S. Westdale Court, Huntsville Alabama 35805
 

 “Tenants have informed me that you plan to redeem the above reference[d] property. If so, the following is a statement of additional lawful charges that must be paid to me under the provisions of Code of Alabama § 40-10-122(b)-(e) in order to effect the redemption:
 

 “1. Paint Interior $ 700.00
 

 “2. Carpet 2 bedrooms $ 165.00
 

 “3. Dishwasher Repair $ 30.00
 

 “4. Remove Trash and Clean $ 150.00
 

 “5. Clean and mow yard $ 50.00
 

 “6. Section and remove fallen tree $ 100.00
 

 “7. State Farm Insurance $1,178.00
 

 “TOTAL $2,373.00”
 

 On February 13, 2006, MERS’s attorney sent Ross the following response:
 

 “Thank you for your letter of February 4, 2006. As I’m sure you are aware,
 
 the court set this for a hearing February 2006,
 
 and, reviewing your itemization costs, in light of § 40-10-122, it would appear that the reasonable and necessary expenses would be limited to $1,195. If you are willing to accept this without a hearing, we will notify the court that the case can be settled without a hearing. Please advise me if this will be acceptable.”
 

 (Emphasis added.)
 

 Ross’s response to that information was another letter to MERS’s counsel on April 28, 2006. That letter stated:
 

 “This letter is to notify you that you have yet to
 
 complete the redemption
 
 of the above referenced property. I have not received payment in the amount of two thousand three hundred and seventy three dollars ($2,373.00) for preservation improvements which I have made, and
 
 my rights to the property have not been terminated.”
 

 (Emphasis added.)
 

 Meanwhile, on March 14, 2006, the trial court in CV-05-917 entered a summary judgment in favor of MERS, thereby ejecting Ross from the property. The same day, the court issued a “writ of possession” in favor of MERS and against Ross, Campbell, and Fletcher. On July 24, 2006, MERS sent Ross a letter apprising him of, among other things, the fact that the court had given it the right to take possession of the property. Two days later, on July 26, 2006, MERS executed a “special warranty deed” conveying the property to the Ro-sen-Ragers.
 

 On August 1, 2006, the Rosen-Ragers entered into an agreement with RPM Realty, Inc. (“RPM”), whereby RPM agreed to manage the property for the Rosen-Ragers to produce rental income. RPM contracted with other entities, including Carpet Crafters, Inc., to clean the residence and to install new carpet. While RPM was thus engaged, Ross leased the property to Charles Hurt and Sharon Baxter. When Carpet Crafters arrived to install the carpet, its workers discovered Hurt and Baxter in the residence. Carpet
 
 *34
 
 Crafters immediately notified RPM, which dispatched its manager Suzanne Tomlin-son to investigate. An altercation ensued, prompting an appearance by the Huntsville Police Department, with Baxter defending her right to possession as Ross’s tenant.
 

 Subsequently, Tomlinson posted on the property a notice of termination of a pos-sessory interest and a “notice to vacate” on September 19, 2006, and October 5, 2006, respectively, which Hurt and Baxter ignored. During this time, according to Baxter, Ross told Baxter simply “to disregard papers that anybody was bringing [her].”
 

 On October 24, 2006, the Rosen-Ragers sued Hurt, Baxter, and Ross in the Madison Circuit Court.
 
 [2]
 
 The complaint alleged, among other things, that Ross had trespassed on the property by “wantonly inducing” Hurt and Baxter to “enter into possession of the property” under “circumstances of insult and contumely.” It alleged that the defendants had “maliciously, willfully, oppressively, and/or wantonly interfered with the Rosen-Ragers’ exclusive possession of the property.” The complaint also contained a claim of intentional interference with business or contractual relations and a claim for ejectment, by which the Rosen-Ragers sought a judgment ordering the defendants “to vacate the property.” In April 2007, the circuit court entered a default judgment against Hurt and Baxter for $18,402.52 in compensatory damages and $26,805.04 in punitive damages. This appeal involves no issue as to the correctness of that judgment.
 

 On October 29, 2007, the Rosen-Ragers moved for a partial summary judgment against Ross on the issues of liability and compensatory damages. Ross filed a cross-motion for a partial summary judgment, contending that MERS’s purported redemption did not comply with § 40-10-122 and was therefore legally ineffective to divest Ross of his possessory interest in the property. On December 19, 2007, the circuit court entered a partial summary judgment in favor of the Rosen-Ragers on their claims, including (1) trespass, (2) wantonness, (3) interference with business or contractual relations, and (4) ejectment. It awarded the Rosen-Ragers $13,843.47 in compensatory damages, but it reserved for a jury trial the issue of Ross’s liability for punitive damages.
 

 The essential issue at trial was whether Ross’s conduct warranted the imposition of punitive damages. Ross took the position that his conduct was justified by MERS’s failure to pay the amount of money he had expended for improvements and insurance premiums. More specifically, Ross testified that the statutory scheme allowed him to remain in possession until he had received payment for those expenditures. However, the circuit court would not allow Ross to
 
 read
 
 from the statutes or to introduce them into evidence. At the close of the trial, the court instructed the jury on the law of wantonness but did not instruct the jury on the relevance, if any, of the statutes on which Ross purported to rely. The jury awarded $350,000 in punitive damages.
 

 The circuit court entered a final judgment on the damages awards on October 24, 2008. That same day, the circuit court scheduled a hearing for review of the punitive-damages award in accordance with this Court’s decisions in
 
 Hammond v. City of Gadsden,
 
 493 So.2d 1374 (Ala.1986), and
 
 Green Oil Co. v. Hornsby,
 
 539 So.2d 218
 
 *35
 
 (Ala.1989) (hereinafter referred to as “the
 
 Hammond
 
 hearing”).
 

 On November 18, 2008, Ross filed a motion for a new trial, which was denied. In a separate order, the circuit court also declined to remit the punitive-damages award. Ross appealed. The issues on appeal involve (1) whether the partial summary judgment was proper, (2) whether the trial was infected with evidentiary errors, and (3) whether the punitive-damages verdict was excessive.
 

 II. Discussion
 

 A. Partial Summary Judgment
 

 “To prevail on [their] claims,” says Ross, “the Rosen-Ragers had to show that they and not Ross owned and had the right to possess the property. Otherwise, Ross committed no trespass, much less a wanton trespass, and the Rosen-Ragers were not entitled to ejectment....” Ross’s brief, at 23. We agree.
 

 “‘“[T]he manner in which the [summary-judgment] movant’s burden of production is met depends upon which party has the burden of proof ... at trial.” ’ ”
 
 Denmark v. Mercantile Stores Co.,
 
 844 So.2d 1189, 1195 (Ala.2002) (quoting
 
 Ex parte General Motors Corp.,
 
 769 So.2d 903, 909 (Ala.1999), quoting in turn
 
 Berner v. Caldwell,
 
 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)). If the movant is the plaintiff with the ultimate burden of proof, his “ ‘proof must be such that he would be entitled to a directed verdict [now referred to as a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.] if this evidence was not controverted at trial.’”
 
 Ex parte General Motors,
 
 769 So.2d at 909 (quoting
 
 Berner,
 
 543 So.2d at 688).
 

 “The first prerequisite for [a summary judgment] in favor of a movant who
 
 asserts
 
 a claim ... is that the claim ... be valid in legal theory, if its validity be challenged.
 
 See Driver v. National Sec. Fire & Cas. Co.,
 
 658 So.2d 390 (Ala.1995). The second prerequisite for [a summary judgment] in favor of
 
 such a movant,
 
 who necessarily bears the burden of proof,
 
 American Furniture Galleries v. McWane, Inc.,
 
 477 So.2d 369 (Ala.1985),
 
 McKerley v. Etowah-DeKalb-Cherokee Mental Health Board, Inc.,
 
 686 So.2d 1194 (Ala.Civ.App.1996), and
 
 Oliver v. Hayes International Corp.,
 
 456 So.2d 802 (Ala.Civ.App.1984), is that each contested element of the claim ... be supported by substantial evidence.
 
 See Driver, supra,
 
 and
 
 McKerley, supra.
 
 The third prerequisite for [a summary judgment] in favor of such a movant is that the record be devoid of substantial evidence rebutting the movant’s evidence on any essential element of the claim....
 
 See Driver, supra,
 
 and
 
 First Fin. Ins. Co. v. Tillery,
 
 626 So.2d 1252 (Ala.1993). Substantial rebutting evidence would create an issue of fact to be tried by the finder of fact and therefore would preclude [a summary judgment].
 
 See Driver, supra,
 
 and
 
 First Financial, supra.
 
 [Summary judgment] in favor of the party who
 
 asserts
 
 the claim ... is not appropriate unless all three of these prerequisites coexist.
 
 See Driver, supra,
 
 and
 
 First Financial, supra, McKerley, supra,
 
 and
 
 Oliver, supra.”
 

 Ex parte Helms,
 
 873 So.2d 1139, 1143 (Ala.2003).
 

 The circuit court essentially held, as a matter of law, that Ross had
 
 wantonly trespassed
 
 on the Rosen-Ragers’ property. “Wantonness in a trespass action is established by the mere knowledge on the part of the defendant of his invasion of the plaintiffs rights.”
 
 Cummans v. Dobbins,
 
 575 So.2d 81, 82 (Ala.1991);
 
 Calvert & Marsh Coal Co. v. Pass,
 
 393 So.2d 955, 957 (Ala.1980). Although good faith is not a
 
 *36
 
 defense to a claim of trespass, a showing of good faith may “refute the charge of ... wantonness.”
 
 Ramos v. Fell,
 
 272 Ala. 53, 58, 128 So.2d 481, 484-85 (1961). Thus, the dispositive question is whether there was substantial evidence that when Ross induced Hurt and Baxter to enter into possession of the property, the Rosen-Ragers had lawful possession of the property, and, if they did, whether there was substantial evidence that Ross placed Hurt and Baxter on the property with a good-faith belief that he had the right of possession.
 

 Ross’s arguments are based on Ala. Code 1975, § 40-10-74 (tax purchaser’s right of possession) and § 40-10-122 (process for redemption of land from tax sale). Section 40-10-74 provides, in pertinent part:
 

 “Any purchaser of lands at a tax sale
 
 other than the state or anyone claiming under him
 
 shall be entitled to possession of said lands immediately upon receipt of certificate of sale from the tax collector;
 
 and, if possession is not surrendered within six months after demand therefor is made by said purchaser or his assignee, the said purchaser or his assignee may maintain an action in ejectment or a statutory real action in the nature of ejectment, or other proper remedy for the recovery of the possession of the lands purchased at such sales and shall be entitled to hold the possession thereof on recovery,
 
 subject, however, to all rights of redemption provided for in this title.”
 

 (Emphasis added.) At the time of the events made the basis of this action, § 40-10-122 provided, in pertinent part:
 

 “(a) In order to obtain the redemption of land from tax sales where the same has been sold to one other than the state, the party desiring to make such redemption shall deposit with the judge of probate of the county in which the land is situated the amount of money for which the lands were sold, with interest payable at the rate of 12 percent per annum from date of sale, and, on the portion of any excess bid that is less than or equal to 15 percent of the market value as established by the county board of equalization, together with the amount of all taxes which have been paid by the purchaser, which fact shall be ascertained by consulting the records in the office of the tax collector, or other tax collecting official, with interest on said payment at 12 percent per annum. If any taxes on said land have been assessed to the purchaser and have not been paid, and if said taxes are due which may be ascertained by consulting the tax collector or other tax collecting official of the county, the probate judge shall also require the party desiring to redeem said land to pay the tax collector or other tax collecting official the taxes due on said lands which have not been paid by the purchaser before he or she is entitled to redeem the same. In all redemptions of land from tax sales, the party securing the redemption shall pay all costs and fees as herein provided for due to officers and a fee of $.50 to the judge of probate for his or her services in the matter of redemption. This application and payment may be executed by an on-line transaction via the Internet or other on-line provision.
 

 [[Image here]]
 

 “(c)
 
 With respect to property which contains a residential structure at the time of the sale
 
 regardless of its location, the proposed redemptioner must pay to the purchaser or his or her transferee, in addition to any other requirements set forth in this section, the amounts set forth below:
 

 “(1)
 
 All insurance premiums paid or owed by the purchaser for casualty
 
 
 *37
 

 loss coverage on the residential structure
 
 with interest on the payments at 12 percent per annum.
 

 “(2) The
 
 value of all preservation improvements made on the property determined in accordance with this section
 
 with interest on the value at 12 percent per annum.”
 

 (Emphasis added.)
 
 [3]
 

 According to Ross, redemption does not occur until the redemptioner complies
 
 fully
 
 with § 40-10-122(a) and (c)(1)-(2), more specifically, until the tax-sale purchaser receives not only the amounts set forth in subsection (a), but also the amounts set forth in subsection (c)(l)-(2),
 
 [4]
 
 namely, the “insurance premiums” and the “value of all preservation improvements” made on the property at the statutory rate of interest. Ross insists that he acquired the right of possession as the tax-sale purchaser, which right, he argues, continues until the property is redeemed in conformity with § 40-10-122. Ross contends that, because he was never paid for improvements and insurance, § 40-10-122 was never triggered, the property
 
 was never actually redeemed,
 
 and he never lost the right of possession.
 

 In response, the Rosen-Ragers state:
 

 “[The payments set forth in § 40-10-122(c) ] are
 
 in addition
 
 to those payments required ‘in order to obtain the redemption’ by subsection (a). Nothing in the plain language of the statute indicates that the requirements of [subsection (c) ] extend to the tax sale purchaser an ongoing ability to possess the redeemed property or interfere with the legal owner’s possession. Rather, they create a right of monetary relief which the tax sale purchaser may pursue. Ross’s pursuit of any right to monetary relief from MERS does not concern the [Rosen-Ragers].... Whether or not Ross is entitled to additional payment from MERS
 
 is simply not a title issue.”
 

 Rosen-Ragers’ brief, at 50-51 (some emphasis added).
 

 Moreover, they state that Ross’s “argument must fail as a statutory Certificate of Redemption, evidencing redemption, was issued by the Madison County Judge of Probate on September 28, 2004.” Rosen-Ragers’ brief, at 47-48. We need not decide whether the failure of the redemption-er to make the payments set forth in subsection (c), standing alone, affects the tax-sale purchaser’s right to possession, because, in any case, a tax-sale purchaser may not simply ignore a certificate of redemption as Ross did in this case.
 

 Ross concedes, as he must, that a certificate of redemption is
 
 prima facie
 
 evidence of redemption. Ross’s brief, at 34. See AIa.Code 1975, § 40-10-81 (“the books and records belonging to the office of the judge of probate ... shall be prima facie evidence of the facts stated therein”); § 40-10-127 (to be evidence of redemption, the certificate must be signed); see also Ala.Code 1975, § 12-13-l(c) (“All orders, judgments and decrees of probate courts shall be accorded the same validity and presumptions which are accorded to judgments and orders of other courts of general jurisdiction.”).
 

 The certificate of redemption was not void on its face. If it was issued erroneously, Ross should have challenged the certificate judicially. Ross does not allege that there was no vehicle by which to
 
 *38
 
 challenge the correctness of the certificate of redemption. Indeed, this Court has said:
 

 “In Alabama, circuit courts have ‘a general superintendence’ over the probate courts. Ala.Code 1975, § 12-11-30(4). Encompassed in this superintendence is the power to review certain judgments and orders of the probate court, either through direct appeal or by-petition for an extraordinary writ. See
 
 Helms v. McCollum,
 
 447 So.2d 687 (Ala.1984). Sections 12-22-2 and 12-22-20, Ala.Code 1975, authorize appeals from final judgments of a probate court to either the circuit court or the Supreme Court.
 

 [[Image here]]
 

 “The appellate jurisdiction of the circuit court can also be invoked by a petition for an extraordinary writ. Ala. Const. of 1901, [§ 142](b). Orders as to which no statute grants appellate jurisdiction are reviewed on petitions for writ of certiorari, mandamus, or prohibition.
 
 Town of Flat Creek v. Alabama By-Products Corp.,
 
 245 Ala. 528, 17 So.2d 771 (1944).”
 

 Franks v. Norfolk Southern Ry.,
 
 679 So.2d 214, 216 (Ala.1996). See
 
 Boyd v. Holt,
 
 62 Ala. 296 (1878) (refusal of the probate judge to issue a certificate of redemption for land sold for taxes was reviewable in the circuit court by a petition for a writ of mandamus).
 

 Redemption divests the tax-sale purchaser of a possessory interest in the property.
 
 Washington v. ORIX Credit Alliance, Inc.,
 
 825 So.2d 828 (Ala.Civ.App.2001). Here, the unchallenged certificate of redemption, issued in September 2004, divested Ross of his possessory interest in the property. Nevertheless, Ross thereafter
 
 leased
 
 the property, first to Fletcher, then to Hurt and Baxter. Thus, Ross caused, as a matter of law, his tenants to trespass on the property.
 

 On the issue of wantonness, it is undisputed that, rather than mount a judicial challenge to the certificate of redemption, Ross simply ignored it and treated the property as though he still had a possessory interest. Although Ross was not formally served with process in
 
 MERS v. Campbell,
 
 CV-05-917, which involved his interest in the property, there was evidence indicating that he knew that that litigation was pending, at least as early as February 13, 2006, that is, before the March 14, 2006, judgment éntered in that case, but chose to ignore that litigation and also instructed his tenants not to respond to notices involving the property.
 

 “If the credibility of court orders and the integrity of our judicial system are to be maintained, a litigant cannot ignore court orders with impunity.”
 
 Kihl v. Pfeffer,
 
 94 N.Y.2d 118, 123, 722 N.E.2d 55, 58, 700 N.Y.S.2d 87, 90 (1999). “A party ignores a valid order of court at its own peril.”
 
 United Servs. Auto. Ass’n v. Strasser,
 
 492 So.2d 399, 402 n. 1 (Fla.Dist.Ct.App.1986).
 

 Regardless of the whether the provisions of § 40-10-122 were properly applied, Ross was not excused or justified in ignoring the judicial orders and processes involving this property. From September 2004 until the commencement of this action on October 24, 2006, at the least, Ross sought to occupy the property by proxy without any justifiable claim of right. There was substantial evidence that Ross induced Hurt and Baxter to enter into possession of the property with knowledge that he had no right of possession, and there was not substantial evidence that Ross acted in good faith or with any justification in so doing. Indeed, Ross’s interpretation of the applicable statutes is so wholly lacking in any foundation in law as
 
 *39
 
 to admit of no other conclusion than that he acted with a state of mind consistent with wantonness as a matter of law.
 

 Ross also argues that the Rosen-Ragers were not
 
 bona fide
 
 purchasers of the property. Specifically, he states:
 

 “As a result of MERS’s failure to redeem, and because the Rosen-Ragers were not
 
 bona fide
 
 purchasers, they acquired the property subject to Ross’s interest.... As a result, Ross continued to have the right to possess and rent the property. Therefore, the Rosen-Ragers failed to prove elements essential to all of their claims, and they were not entitled to summary judgment on
 
 any
 
 claim.”
 

 Ross’s brief, at 44-45 (emphasis in original). In response, the Rosen-Ragers contend that their “status as
 
 bona fide
 
 purchasers is
 
 irrelevant,
 
 as Ross possessed no claim in the property against which [they] must assert their status as
 
 bona fide
 
 purchasers.” Rosen-Ragers’ brief, at 55 (emphasis added). We agree with the Rosen-Ragers.
 

 Ross lost his interest in the property when he failed timely to challenge the certificate of redemption. The loss foreclosed Ross’s defenses against any trespass claim that might have been brought by MERS, as well as his defenses against the Rosen-Ragers, regardless of whether they were
 
 bona fide
 
 purchasers of MERS’s interest. Consequently, the circuit court did not err in entering a summary judgment for the Rosen-Ragers on their claim of wanton trespass.
 

 B. Evidentiary Issues at Trial
 

 Ross raises two issues relating to the admissibility of evidence during the trial of the case, which errors are reviewed to determine whether the circuit court exceeded its discretion.
 
 Bowers v. Wal-Mart Stores, Inc.,
 
 827 So.2d 63, 71 (Ala.2001). According to Ross, some evidence was improperly admitted, while some evidence was improperly excluded. “A trial court’s ruling on the admission or exclusion of evidence will be reversed only if it is shown that the trial court exceeded its discretion in so ruling.”
 
 Jimmy Day Plumbing & Heating, Inc. v. Smith,
 
 964 So.2d 1, 7 (Ala.2007).
 

 1. Admission of Evidence of Defendant’s Wealth
 

 First, Ross contends that the circuit court improperly allowed the Rosen-Ragers to place before the jury evidence of Ross’s financial condition. Specifically, the Rosen-Ragers presented evidence indicating that, including the $1,612.93 MERS had paid to redeem the property — which money Ross refused to collect — the Madison County Probate Court was holding approximately $150,000 that Ross was refusing to collect in other such cases for similar reasons. According to Ross, he “had acquired a number of tax-sale properties” for which he had not been reimbursed for insurance and improvements, and he was refusing payment as in this case, “because he was concerned that accepting the probate money might be construed as ratification of an incomplete redemption.” Ross’s brief, at 53.
 

 The Rosen-Ragers contend that the evidence that Ross was refusing to collect money held for him by the probate court was admissible to show that Ross’s refusal to relinquish possession of the property in this case was part of a systematic scheme or practice calculated to deny the rights of “legal title holders to peacefully possess their property,” Rosen-Ragers’ brief, at 61, and that, in any case, Ross did not properly object to the evidence when proffered. In connection with the non-preservation argument, the following colloquy occurred at trial during the testimony of Jan
 
 *40
 
 Dismuke, an accountant clerk at the Madison County Probate Office:
 

 “Q. [By the Rosen-Ragers’ counsel:] Did Mr. Ross ever come and pick that money up?
 

 “A. [By Dismuke:] No, sir.
 

 “Q. How much redemption money are you holding for Howard Ross that he has not come and picked up?
 

 “[By Ross’s counsel:]
 
 Objection, Judge, that’s irrelevant.
 

 “[The court:] Overruled.
 

 “Q. [By the Rosen-Ragers’ counsel:] You may answer.
 

 “A. One hundred and forty-nine thousand, two hundred and thirty-seven dollars and fifty-nine cents.
 

 “Q. No more questions.”
 

 (Emphasis added.)
 

 It is well settled that a “specific objection is a condition precedent to appellate review while a general objection is a waiver of appellate review.... A general objection to evidence is one which does not definitely and specifically state the ground upon which it is based so that the court may intelligently rule on it.” II Charles W. Gamble & Robert J. Goodwin,
 
 McElroy’s Alabama Evidence
 
 § 426.01(7), at 2125 (6th ed.2009) (hereinafter referred to as
 
 “McElroy
 
 ”). This rule applies “unless the evidence is patently illegal and cannot be made legal for any purpose.”
 
 Harris v. Martin,
 
 271 Ala. 52, 53, 122 So.2d 116, 118 (1960). An objection on the ground that the proffered evidence is “irrelevant” is a general objection.
 
 Few v. State,
 
 518 So.2d 835, 837 (Ala.Crim.App.1987);
 
 Manson v. State,
 
 349 So.2d 67, 81 (Ala.Crim.App.1977). “The party who lodges a general objection at trial may not expand the objection on appeal by including specific grounds.”
 
 McElroy, supra,
 
 at 2125.
 

 Dismuke’s testimony was not patently inadmissible and illegal for every purpose. It bore a logical relationship to the ultimate question — whether Ross had consciously or deliberately engaged in oppression or wantonness with regard to the Rosen-Ragers. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. Indeed, Ross essentially concedes that evidence of multiple, similar instances of ignoring certificates of redemption would have been admissible for that purpose. In this Court, Ross states: “The Rosen-Ragers could have made their point simply by asking the probate clerk
 
 how many
 
 other tax-sale properties Ross owned as to which he had not picked up funds deposited for redemption. The
 
 amount
 
 of funds deposited was ... inadmissible evidence of Ross’s financial condition.” Ross’s reply brief, at 27-28 (emphasis in original). This is an argument that should have been made to the circuit court at the time of the proffer, not for the first time in this Court. Because Ross did not properly object to Dismuke’s testimony, he is not entitled to a reversal based on its allegedly improper admission.
 

 2. Exclusion of the Tax-Sale and Redemption Statutes
 

 During the trial, Ross attempted to read to the jury, or otherwise to place in evidence, portions of the redemption and tax-sale statutes, which, he alleged, gave him the right to place tenants on the property after, and despite, the issuance of the certificate of redemption. After an objection by the Rosen-Ragers’ counsel, Ross’s counsel stated to the circuit court:
 

 “If we can read certain aspects of the statute.... That gives us an opportunity to show our primary defense of justi
 
 *41
 
 fication. If we are not able to discuss the specific statute and what it states and his understanding of it at all, then I think that entirely eliminates our ... defense.
 

 [[Image here]]
 

 “... If there is
 
 no degree
 
 that Mr. Ross would have
 
 any justification,
 
 then, obviously, the [punitive] damages could be higher. If there is
 
 complete justification
 
 for the actions that he has done, even though you determined they’re wrong previously, there would be no damages, conceivably.”
 

 (Emphasis added.)
 

 The circuit court disallowed Ross’s proffer. Ultimately, it charged the jury solely on wantonness as a basis for punitive damages. Ross objected to the charge on the ground that it did not contain an instruction on reliance on the statutes as “justification.” That objection was overruled. Ross now argues that the judgment entered on the jury’s verdict must be reversed, because, he says, “[e]xcluding the statutes deprived the jury of information vital to assessing [his] conduct and determining whether and what punishment was appropriate.” Ross’s brief, at 57.
 

 We disagree with this argument. The partial summary judgment finding Ross liable for wantonness being proper as discussed above, Ross’s alleged understanding of the statutes was irrelevant. The admission of the statutes into evidence would merely have invited the jury to
 
 nullify
 
 the partial summary judgment, which had correctly resolved in the Rosen-Rag-ers’ favor the issue whether, as a matter of law, Ross was justified to
 
 any
 
 degree. Consequently, the circuit court did not exceed its discretion in shielding the jury from the text of the statutes.
 

 C. Review of the Punitive-Damages Award
 

 Finally, Ross contends that the punitive-damages award is excessive, and he seeks a substantial remittitur. This Court has a duty to conduct a
 
 de novo
 
 review of a punitive-damages award.
 
 Acceptance Ins. Co. v. Brown,
 
 832 So.2d 1 (Ala.2001). According to Ross, the amount of the jury’s verdict “far exceeds” the amount that, as stated in
 
 Green Oil Co. v. Hornsby,
 
 539 So.2d at 222, “ ‘will accomplish society’s goals of punishment and deterrence.’ ” Ross’s brief, at 60.
 

 In reviewing a punitive-damages award, we apply the factors set forth in
 
 Green Oil,
 
 within the framework of the “guideposts” set forth in
 
 BMW of North America, Inc. v. Gore,
 
 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and restated in
 
 State Farm Mutual Automobile Insurance Co. v. Campbell,
 
 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). See
 
 AutoZone, Inc. v. Leonard,
 
 812 So.2d 1179, 1187 (Ala.2001)
 
 (Green Oil
 
 factors remain valid after Gore).
 

 The
 
 Gore
 
 guideposts are: “(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.”
 
 Campbell,
 
 538 U.S. at 418, 123 S.Ct. 1513. The
 
 Green Oil
 
 factors, which are similar, and auxiliary in many respects, to the
 
 Gore
 
 guideposts, are:
 

 “(1) the reprehensibility of [the defendant’s] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant’s] conduct; (3) [the defendant’s] profit from [his]
 
 *42
 
 misconduct; (4) [the defendant’s] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.”
 

 Shiv-Ram, Inc. v. McCaleb,
 
 892 So.2d 299, 317 (Ala.2003) (paraphrasing the
 
 Green Oil
 
 factors).
 

 1.
 
 Gore
 
 Reprehensibility Guidepost and
 
 Green Oil
 
 Factors (1), (2), (5), and (7)
 

 “Perhaps the most important
 
 in-dicium
 
 of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.”
 
 Gore,
 
 517 U.S. at 575. The circuit court’s
 
 Hammond
 
 order is instructive on this point; it states, in pertinent part:
 

 “Ross is an anathema upon the court system and the public. He has engaged in a pattern and practice of ignoring and actively avoiding the authority of the courts himself, while using hyper-technical or distorted interpretations of the law that suit him against others. The harm Ross causes in the process is substantial, not only to the private parties directly involved, but also to the integrity of the law and the integrity of society.
 

 “In this case, Ross purchased the tax interest in the property at issue. [MERS], holding a pre-existing mortgage on the property, foreclosed upon and then redeemed the property from the tax sale by payment to the Madison County Judge of Probate, receiving a Certificate of Redemption. Ross began negotiation with [MERS] for further payment to him for purported improvements he made to the property. Simultaneously, [MERS] instituted Court proceedings to remove Ross’s tenants from the property. Ross’s knowledge of and involvement with those proceedings is evident, as is his avoidance of legitimately having his entitlement to any payments finally determined through such proper channels. Ross made considerable effort to keep his right to additional payments a live issue, giving him, in his mind, a colorable claim to possess the property, while actively avoiding any action he might be required to admit resolved the issue. Ross also, during the relevant time, unsuccessfully sued [Fletcher] for failing to pay him rent on the involved property and received a judgment indicating he was not entitled to collect rent from tenants on that property
 
 [Ross v. Fletcher,
 
 DV-05-2689].
 

 “Despite ... court rulings that provided Ross ample notice of his tenuous position, Ross persisted in possessing the property and renting it to tenants. [MERS], having received a final order of the Madison County Circuit Court ejecting Ross’s tenants, informed Ross of that Court action and conveyed the property to the [Rosen-Ragers]....
 

 [[Image here]]
 

 “Ross’s conduct in this case cannot be viewed in isolation. This Court previously adjudicated the case of
 
 Cindy L. Schrock v. Howard Ross,
 
 CV 06-900. In that case, Ross also purchased the tax interest in a property. That property was redeemed by a mortgage company after foreclosing on the property. That property was sold to an innocent third party, Cindy Schrock. Ms. Schrock entered into her new property and evidenced her possession. When Ms. Schrock was away from her property on vacation, Ross moved tenants in and fought to keep them in the property. This Court, after a full trial, restored possession to Ms. Schrock and ordered Ross to pay damages of $16,639.
 

 [[Image here]]
 

 
 *43
 
 “The scope of Ross’s enterprise, as well as his general way of doing business, is further evidenced by the fact that the Madison County Judge of Probate holds approximately $150,000 for Ross. When the property at issue in this case was redeemed by a payment of approximately $1,600 to the Probate Judge, Ross did not collect the redemption money, to which he was entitled, as the tax sale purchaser. According to Ross’s testimony, he purposely failed to collect the funds for concern that his claims to possession of the property would thereby be diminished. Similar evidence was presented in Ms. Schrock’s case. Ross’s approach to these funds is further evidence of the reprehensible gamesmanship he applies to his enterprise. The accumulation of these funds to approximately $150,000 evidences the vastness of his scheme. Finally, that Ross would deny himself possession of such a sum to further his scheme is evidence of its profitability and Ross’s resources.
 

 “Any citizen owning one of the numerous properties represented by the $150,000 in redemption proceeds held for Ross by the Probate Judge must beware. Ross avoids collecting those funds to aid his articulation of an excuse for possession of those properties. Ross has demonstrated that, if he can find those properties vacant due to an owner’s holiday vacation, renovation or otherwise, he will lease them. He will lease them after a court rules his tenants cannot possess them. He will lease them after a court rules he is not entitled to collect rent on them. Every month he can lease them equals another rental payment received. He will not prosecute a resolution of his articulated excuses for possessing the properties or collect redemption payments due him, because to do so would alleviate excuses for possession and collecting further rent.
 

 “Ross’s tactics are of great concern. Each time Ross places tenants in a home belonging to another (whether the homeowner be on vacation or absent for other reasons), he places tenants and homeowners at great risk for dangerous confrontation. Each time he displays to a homeowner his ability to, in fact, place tenants in their home and collect rent in the face of deeds, certificates of redemption, court orders and other protections in which our society vests faith, he erodes confidence in our society and encourages the worst of behavior. Ross challenges those in his path to navigate the Court system and laws (with which he is quite experienced) and stop him if they can.
 

 “The purpose of a punitive damages award is to deter conduct. Many court rulings should have deterred Ross before the punitive damages award in this case. Ross, however, is persistent.”
 

 The circuit court correctly noted that this case cannot be considered in a vacuum. Although it is unrefuted that service of process was never formally effected upon Ross in
 
 MERS v. Campbell,
 
 CV-05-917, in which he could have resolved the precise issue regarding his possessory interest in this property, he had actual notice of ongoing litigation as early as February 13, 2006, when MERS informed him of an imminent hearing involving his claim to the itemized expenses. Also, as the trial court’s
 
 Hammond
 
 order reveals,
 
 Schrock v. Ross,
 
 CV-06-900, was another civil action involving similar conduct in which an identical substantive issue was litigated to a conclusion adverse to Ross.
 
 (Green Oil
 
 factor (7).) Ross appealed the judgment entered in that case, and this Court affirmed the judgment without an opinion on December 7, 2007.
 
 Ross v. Schrock, 25
 
 
 *44
 
 So.3d 1204 (Ala.2007) (table). Although the trial court’s final judgment in
 
 Schrock
 
 was not entered until December 22, 2006, that is, approximately two months after the Rosen-Ragers sued Ross,
 
 Schrock
 
 is still evidence of similar conduct, though not necessarily of Ross’s knowledge of wrongdoing.
 

 With regard to the cost of litigation
 
 (Green Oil
 
 factor (5)), the Rosen-Ragers submitted the affidavit of their attorney, which stated that the Rosen-Ragers had already paid attorney fees totaling $9,880.41 and had incurred other expenses totaling $6,247.21. In lieu of the further payment of attorney fees on an hourly basis, the Rosen-Ragers agreed to pay their counsel an undisclosed percentage of any sums ultimately collected from Ross. Notwithstanding this contingency-fee arrangement, the Rosen-Ragers’ counsel computed the hours expended by the legal professionals employed as if billed at the regular hourly rates and arrived at $82,000 as the value of costs, expenses, and legal fees attributable to the prosecution of this case.
 

 To be weighed against these observations is the fact that the purchasing of tax-sale property is, in itself, a laudable practice,
 
 one to be encouraged,
 
 rather than discouraged. Hence, “[t]he Alabama legislature ... has enacted statutes
 
 favoring
 
 the sale of land to secure payment of delinquent taxes.” William R. Justice,
 
 Redemption of Real Property Following Tax Sales in Alabama,
 
 11 Cumb. L.Rev. 331, 331 (1980) (emphasis added). Ross testified that if the punitive-damages verdict is upheld, it will “effectively put [him] out of business regarding properties that [he] could afford to buy at tax sales,” and he will simply stop purchasing tax-sale properties. Because such a result would be counterproductive, the goal must be not to discourage Ross from engaging in the practice
 
 per se,
 
 but essentially to dissuade him from ignoring probate court orders and certificates. He has already been required to pay $16,639 in the
 
 Schrock
 
 case.
 

 2. Civil-Penalties Guidepost in Gore
 

 The parties do not discuss this guidepost or direct us to any evidence or authority related to its application.
 

 3.
 
 Gore
 
 Guidepost of Disparity Between the Damage and the Award and
 
 Green Oil
 
 Factors (3) and
 
 ft)
 

 The final
 
 Gore
 
 guidepost we will consider is “the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award.”
 
 Campbell,
 
 538 U.S. at 418. The Rosen-Ragers’ complaint does not include claims based on personal injury. There is only the
 
 potential
 
 for personal injury each time Ross’s practice of deliberately ignoring certificates of redemption brings competing claimants for the same property into direct physical contact.
 

 Also, “ ‘[i]f the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.... The financial position of the defendant [is also] relevant.’”
 
 Green Oil,
 
 539 So.2d at 223 (quoting
 
 Aetna Life Ins. Co. v. Lavoie,
 
 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially) (factor (3))). Ross profits from this scheme by keeping tenants on properties until they are evicted by judicial action, in some cases, long after the issuance of the certificates of redemption. In this case, Hurt and Baxter paid Ross approximately $1,000 in rent.
 

 Although Ross values his assets at $1,167,000, his testimony at the
 
 Hammond,
 
 hearing regarding his financial condition was confusing, at best, and failed to establish anything definitive regarding his sta
 
 *45
 
 tus.
 
 (Green Oil
 
 factor (4).) In that connection, the circuit court stated: “Ross has not provided this court credible evidence upon which to fully judge his financial condition.” Indeed, the evidence he
 
 did
 
 offer as to his financial condition was referable only to the
 
 time of trial and later,
 
 rather than to the “time of the occurrence made the basis of the suit,” as required by Ala.Code 1975, § 6—11—21(c), to establish the specific damages limitations provided in § 6-ll-21(b) for “a small business.”
 

 Viewing these factors
 
 in toto,
 
 including the limited objective to be achieved and the absence of any actual personal injury, we conclude that a $120,000 punitive-damages award is sufficient to punish Ross and to deter further conduct similar to that evidenced in this case, without compromising his due-process rights.
 

 III. Conclusion
 

 In conclusion, the partial summary judgment is affirmed. The judgment entered on the jury’s punitive-damages verdict is affirmed, on the condition that the Rosen-Ragers file with this Court, within 21 days, a remittitur of the punitive-damages award to $120,000; otherwise, the judgment will be reversed and the cause remanded for a new trial on the issue of punitive damages.
 

 AFFIRMED IN PART AND AFFIRMED CONDITIONALLY IN PART.
 

 COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . Although Fletcher eventually vacated the premises, the time and circumstances of his departure are unclear and, in any case, are irrelevant to this appeal.
 

 [2]
 

 . In a separate action commenced by the Rosen-Ragers in the Madison District Court against Hurt and Baxter (DV-06-2950), the court entered an "unlawful detainer judgment” against Hurt and Baxter and in favor of the Rosen-Ragers.
 

 [3]
 

 . Section 40-10-122 was most recently amended in 2009.
 

 [4]
 

 . Subsection (c) is relatively new. It was added in 2002 by Act No. 2002-426, Ala. Acts 2002.