STUART, Justice.
Ligón Capital, LLC (“Ligón”), and its subsidiary HTI Hydraulic Technologies, LLC (“HTI”), sued CNH America, LLC (“CNH”), in the Jefferson Circuit Court, asserting breach-of-contract, fraudulent-misrepresentation, and fraudulent-suppression claims stemming from CNH’s decision to stop using HTI as a supplier of hydraulic cylinders. Following a two-week trial, the jury returned a verdict in favor of Ligón and HTI on their fraudulent-suppression claims, awarding them $3.8 million in compensatory damages and $7.6 million in punitive damages. The trial court entered a judgment on that verdict, and CNH appeals. We affirm.
I.
In July 2007, Hydraulic Technologies, Inc. (“Hydraulic”), a manufacturer of hydraulic cylinders based in Ohio, filed for bankruptcy. Hydraulic’s primary customer at the time was CNH, which incorporated Hydraulic’s custom-made cylinders into various pieces of construction and agricultural equipment that it manufactured at different plants throughout the United States. Hydraulic was CNH’s sole supplier for a number of custom-made cylinders, and CNH depended on Hydraulic’s delivering its cylinders to CNH plants on schedule in order for CNH to meet its own production schedule. For some period before Hydraulic filed for bankruptcy, it had been suffering economic problems and had had difficulty fulfilling CNH’s orders with quality products in a timely fashion, largely as a result of credit problems that were interfering with its ability to purchase materials from its own overseas suppliers.
*1199 Seeing an opportunity, Ligón, a holding company based in Birmingham that specializes in purchasing underperforming hydraulic-cylinder manufacturers, began investigating Hydraulic as a potential acquisition. As part of the due-diligence process, Ligón representatives visited Hydraulic’s Ohio facility, where they met with CNH’s on-site representative and participated in a conference call during which CNH’s difficulties with Hydraulic were discussed. In order to keep Hydraulic production — and by extension CNH production — going, Ligón ultimately agreed to guarantee payment to Hydraulic’s suppliers so that Hydraulic could obtain the materials it needed to produce the cylinders destined for CNH. In September 2007, the bankruptcy court approved the sale of substantially all of Hydraulic’s assets to HTI, an entity Ligón had formed for this purpose. HTI, with Ligon’s financial aid and support, then began producing cylinders and supplying them to CNH.
CNH’s quality and efficiency concerns continued after HTI replaced Hydraulic as a supplier. Throughout the fall of 2007, CNH conducted daily conference calls with HTI to make sure that HTI distributed completed cylinders to the CNH plants that most needed the cylinders. CNH also provided HTI with a quality engineer who worked at HTI’s facility as many as four or five days a week to help HTI improve its manufacturing processes. For its part, HTI absorbed hundreds of thousands of dollars in excess freight charges to express-order raw materials and to express-deliver completed cylinders to CNH, and, in early 2008, HTI invested $3.2 million in new machinery to be used to fill CNH orders.
Throughout this time, the relationship between HTI and CNH was not governed by a contract guaranteeing that CNH would purchase or that HTI would supply a certain number of cylinders for any set period. In fact, when Hydraulic’s assets were purchased, HTI chose not to assume an existing contract Hydraulic had with CNH that required CNH to give 180 days’ notice before terminating their relationship.[1] Instead, CNH and HTI did business based on orders and forecasts CNH communicated to HTI using a computer system known as the CNH supplier communications network (“the CSCN”). Through the CSCN, HTI was provided weekly updates of CNH’s firm orders, as well as forecasts for future orders expected over approximately the next year. It was expected that HTI would use the forecasts to ensure that its supply of raw materials, which sometimes took over six months to arrive, would allow it to fulfill CNH’s orders as they became final. The CSCN contained disclaimers indicating that its forecasts were not binding, and it is undisputed that HTI understood that the forecasts were subject to change; however, CNH repeatedly emphasized to HTI that it needed to purchase its raw materials based on the forecasts so that CNH’s supply of cylinders would be uninterrupted.
Unbeknownst to Ligón or to HTI, CNH had made a decision no later than September 2007 to terminate its relationship with HTI and to obtain the cylinders Hydraulic and HTI formerly provided from an alternate supplier. At the time CNH made that decision, it did not know exactly what company would replace HTI or when exactly the transition would occur; however, it was decided that HTI would no longer serve as a supplier once an alternate supplier was arranged. The finality of CNH’s decision is evidenced by a September 2007 *1200 presentation made to CNH executives by Karthick Selvan, the CNH commodity buyer who primarily dealt with HTI, at which he stated that CNH’s plan of action was to “Exit HTI 100%” and to “phase in alternate suppliers by May, 08.” In fact, that plan was realized, and, on May 30, 2008, CNH notified HTI that it was terminating their relationship and that HTI was being replaced by Rosenboom Machine & Tool, Inc., which CNH had been working with as a possible replacement for HTI since at least August 2007. HTI continued to fill existing orders for CNH after being given notice; however, CNH placed no new orders with HTI after giving the termination notice, although the CSCN had previously contained forecasts predicting orders through April 2009. HTI thereafter attempted to cancel its outstanding orders for-raw materials that were intended to be used in the production of custom cylinders for CNH; however, it was ultimately left with approximately $2.3 million of inventory that was unsuitable for any other purpose.
On January 30, 2009, Ligón and HTI sued CNH, alleging that they had suffered damages in excess of $6.8 million as a result of CNH’s breach of contract, fraudulent misrepresentation, and fraudulent suppression. The trial court thereafter disposed of some of Ligón and HTI’s claims on summary judgment; however, on December 5, 2011, two of HTI’s breach-of-contract claims, as well as Ligon’s and HTI’s separate claims alleging fraudulent misrepresentation and fraudulent suppression, proceeded to trial. At the close of all the evidence, CNH moved for a judgment as a matter of law, which the trial court granted in part, entering a judgment in CNH’s favor on the fraudulent-misrepresentation claims. The case was then submitted to the jury, which ultimately returned a verdict in favor of CNH on HTI’s breach-of-contract claims and in favor of Ligón and HTI on their fraudulent-suppression claims. Without distinguishing between Ligón and HTI, the jury awarded them $3.8 million in compensatory damages and $7.6 million in punitive damages. The trial court subsequently entered a judgment consistent with that verdict.
CNH thereafter filed a postjudgment motion seeking a judgment as a matter of law or, in the alternative, a new trial, as well as a separate postjudgment motion seeking a remittitur of the punitive damages. Following a hearing, the trial court denied both motions. On June 1, 2012, CNH filed the instant appeal.
II.
On appeal, CNH argues that the trial court erred by denying CNH’s motion for a judgment as a matter of law on Ligon’s and HTI’s fraudulent-suppression claims, that the trial court exceeded its discretion in denying CNH’s motion for a new trial, and that the trial court erred by denying CNH’s motion seeking a remittitur of the punitive damages.
We first review the trial court’s decision denying CNH’s motion seeking a judgment as a matter of law. We review that decision pursuant to the following standard of review:
‘When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a (judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have pre *1201 sented substantial evidence in order to withstand a motion for a ¡judgment as a matter of law]. See § 12-21-12, Ala.' Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
CNH argues that the trial court erred in denying its motion for a judgment as a matter of law on Ligon’s and HTI’s fraudulent-suppression claims because, it argues, they failed to put forth substantial evidence establishing the elements of a fraudulent-suppression claim. The statutory basis of a fraudulent-suppression claim is § 6-5-102, Ala.Code 1975, which provides that “[suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.” This Court defined the elements of a fraudulent-suppression claim under § 6-5-102 in Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61, 63 (Ala.1996):
“The elements of a cause of action for fraudulent suppression are: (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.”
The gravamen of Ligon’s and HTI’s fraudulent-suppression claims is that CNH decided in approximately September 2007 to replace HTI as a supplier of cylinders and then fraudulently suppressed that fact from Ligón and HTI for approximately eight months, inducing them to take actions and expend funds in an impossible attempt to foster an ongoing relationship between HTI and CNH. CNH denies that it made a definitive decision to terminate its relationship with HTI in September 2007 and that it had any duty to disclose to Ligón and HTI that it was terminating its relationship with HTI before it did so in May 2008. CNH further argues that, even if it did breach a duty to disclose and did conceal material facts, there is no evidence indicating that that concealment reasonably induced Ligón and HTI to act to their detriment. Thus, CNH effectively argues that'substantial evidence is lacking with regard to each of the elements of fraudulent suppression.
We first consider whether Ligón and HTI established that CNH had a duty to disclose to them that, in approximately September 2007, CNH had made the decision to replace HTI as its supplier of certain cylinders. In Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So.2d 883, 892 (Ala.2005), this Court explained that, in a commercial transaction involving arm’s length negotiations, the parties have no general obligation to disclose any specific information to the other, but each has an affirmative duty to respond truthfully and accurately to direct questions from the other. Thus, whether CNH had a duty to disclose to Ligón and HTI, before May 2008, that it had decided to terminate its relationship with HTI depends on (1) whether Ligón and HTI ever asked CNH direct questions regarding the *1202 status of HTTs ongoing relationship with CNH and (2) whether CNH answered any such questions truthfully and accurately.
Ligón and HTI argue that evidence was adduced at trial indicating that HTI’s general manager, Glen Campbell, did in fact direct multiple inquiries to CNH representatives regarding the status of HTI’s ongoing relationship with CNH after CNH had already made the decision to terminate that relationship and that those representatives misled him with their responses. For example, Campbell testified that he specifically asked Selvan in September 2007 if HTI was “still going to be [CNH’s] supplier going forward,” and, according to Campbell, Selvan responded that “[CNH] need[ed] [HTI] in the short term and long term, we are committed.” Campbell further testified that, in early 2008, shortly after HTI purchased $3.2 million in machinery to meet CNH’s demands, he had another conversation with Selvan in which he stated: “[W]e’re spending a lot of money to fill your needs, and it’s commitment on our part. Where does CNH lie?” He testified that Selvan responded by referring him to the CSCN, telling him to look at the firm orders and the forecast orders and to continue to send product to CNH in accordance with those orders. Campbell also testified that he had a similar conversation with Allessandra Canali, a commodity manager in the purchasing department at CNH, during which he inquired about entering into a contract with CNH. According to' Campbell, Canali stated that CNH was not interested in entering into a contract but that it was committed to HTI short-term and long-term and that HTI needed to continue to follow the CSCN. CNH argues that Campbell’s questions were too vague and otherwise insufficient to give rise to a duty to disclose.
In Freightliner, we explained what type of question would be sufficiently specific to give rise to a duty to disclose when we stated that “ ‘[a] disclosing party cannot be punished for fraudulent suppression unless the questioning party articulates with reasonable clarity the particular information it desires.’ ” 982 So.2d at 893 (quoting Shutter Shop, Inc. v. Amersham Corp., 114 F.Supp.2d 1218, 1226 (M.D.Ala.2000)). In this ease, there is no question but that the CNH representatives understood exactly what Campbell was inquiring about when he asked: “Is HTI still going to be [CNH’s] supplier going forward?” and “Is [CNH] continuing to stay with us?”— whether CNH was going to replace HTI. Indeed, to its credit, CNH does not even argue that its employees did not understand the thrust of Campbell’s questions; it essentially takes the position that those employees gave cleverly worded answers that might be technically true depending on one’s view of the terms “long-term” and “commitment.”[2] Campbell’s questions therefore “articulate[d] with reasonable clarity the particular information [he] desire[d]” and were accordingly reasonably specific and direct so as to impose a duty to disclose upon CNH.
Moreover, even if we were to conclude that Campbell’s questions were not reasonably specific and direct, this Court also stated in Freightliner that “once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated.” 932 So.2d at 895. Ligón *1203 and HTI argue that once Selvan told Campbell that “CNH needed [HTI] in the short term and long term, we are committed,” he and CNH assumed the duty to make a full and fair disclosure without concealing other relevant facts within his knowledge. See First Alabama Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1056 (11th Cir.1990) (“Finally, even if one is not under a duty to speak, if he decides to do so, ‘he must make a full and fair disclosure,’ without concealing any facts within his knowledge.” (quoting Ellis v. Zuck, 409 F.Supp. 1151, 1158 (N.D.Ala.1976), and citing Jackson Co. v. Faulkner, 55 Ala.App. 854, 315 So.2d 591 (1975))). There can be no dispute but that the fact that CNH had already decided to replace HTI materially qualified Sel-van’s statement that CNH was “committed” to HTI. “The duty imposed on the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful.” Freightliner, 932 So.2d at 895. See also Ellis, 409 F.Supp. at 1158 (“So it is that if a franchisee raises a question the franchisor must avoid half-truths.”). Thus, even if a duty to disclose was not otherwise created by Campbell’s questions, that duty was certainly assumed by CNH when Selvan and Canali voluntarily spoke of CNH’s long-term commitment to HTI.
CNH argues on appeal, however, that even if Campbell’s questions gave rise to a duty on the part of CNH to disclose the plan to switch suppliers, that duty extended only to Campbell’s employer, HTI. There is no evidence, CNH argues, that anyone from Ligón asked a question or engaged in a conversation that might have given rise to such a duty. Therefore, CNH argues, it was entitled to a judgment as a matter of law on Ligon’s fraudulent-suppression claim and, under the “good count-bad count” doctrine described in As-pinwall v. Gowens, 405 So.2d 134 (Ala.1981), a new trial is required because the jury returned a general verdict in favor of both Ligón and HTI and this Court “cannot assume that the verdict was based only on those ... claims that were properly submitted to the jury.” Waddell & Reed, 875 So.2d at 1165.
However, although it does appear that no one from Ligón separately asked a question that might give rise to a duty to disclose under Freightliner, we disagree that the trial court erred by failing to enter a judgment as a matter of law in favor of CNH on Ligoris fraudulent-suppression claim. At the close of Ligoris and HTI’s case, and again at the close of all the evidence, CNH moved the trial coui't for a judgment as a matter of law on all of Ligoris and HTI’s claims. Indeed, CNH submitted written motions asserting its arguments in that respect and the first numbered paragraph in each of those motions reads as follows:
“Plaintiffs Ligón Capital, LLC (‘Li-gón’) and HTI [Hydraulic] Technologies, LLC (‘HTI’) failed to introduce substantial evidence to prove each element of their claim for fraudulent suppression. These elements are: (1) CNH concealed from them a material fact; (2) CNH had a duty to disclose the fact; (3) Plaintiffs reasonably relied on CNH’s concealment of the material fact; and (4) as a result of their action, the Plaintiffs suffered injury.”
(Emphasis added.) Elsewhere in these motions, CNH continued to argue as if Ligón and HTI jointly asserted one fraudulent-suppression claim, instead of each asserting their own claim. Indeed, the record reveals that the trial court and all the parties generally treated Ligoris and HTI’s fraudulent-suppression claims as a collective claim throughout the trial. Nowhere in those two motions did CNH dis *1204 tinguish between Ligon’s claim and HTI’s claim, or argue that Ligón individually, as opposed to Ligón and HTI collectively, had failed to introduce substantial evidence in support of its claim. Moreover, following the close of evidence, CNH submitted a proposed verdict form that again treated Ligon’s and HTI’s individual fraudulent-suppression claims as a single collective claim. It was not until after the verdict was returned and a judgment entered thereon that CNH argued for the first time, in its postjudgment motion, that Li-gón had a separate fraudulent-suppression claim, the elements of which were not proven even if HTI proved the elements of its own separate claim.
Although a judgment as a matter of law is generally appropriate when an element of a plaintiffs claim is not established, Kmart Corp. v. Bassett, 769 So.2d 282, 284 (Ala.2000), the opposing party still needs to properly move for that judgment. See generally Rule 50(a)(2), Ala. R. Civ. P. (“Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.”). In BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 208, 213 (Ala.2001), this Court recognized that “‘[t]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of ' the movant’s position.’ ” (Quoting Pruitt v. Pruitt, 343 So.2d 495, 500 (Ala.1976) (internal quotation marks omitted).) In this case, we cannot conclude that CNH made the argument, much less that the trial court was aware of that argument, that Ligón failed to prove its fraudulent-suppression claim. Rather, CNH’s sole argument regarding fraudulent suppression in its motions for a judgment as a matter of law was that Ligón and HTI failed to prove their fraudulent-suppression claim. In considering that argument, the trial court did not err in rejecting it because, as described supra, CNH did have a duty to disclose under the Freight-liner test, and, as described infra, substantial evidence was adduced at trial supporting each of the other elements of a fraudulent-suppression claim. By treating Ligon’s and HTI’s separate claims as a collective claim in its motions for a judgment as a matter of law and throughout most of the trial, CNH invited the error it alleges occurred and thus lost the right to now make the waived argument to this Court. See Clements v. Alabama State Bar, 100 So.3d 505, 512 (Ala.2012) (stating that a party will not be permitted to allege an error in the trial court proceedings that was invited by him or that was the natural consequences of his actions), and Ex parte Grand Manor, Inc., 778 So.2d 173, 177 (Ala.2000) (“[WJhere the defendant does not challenge the ‘bad counts’ (i.e., those not supported by substantial evidence) with specificity in his motions for [a judgment as a matter of law], this Court will presume that the verdict was returned on the ‘good count.’ ” (emphasis added)).
We next consider whether Ligón and HTI established that CNH concealed or disclosed material facts. CNH denies that it did because, it claims, although it was exploring other suppliers in September 2007, a process it calls “re-sourcing,” it did not make the final decision to terminate its relationship with HTI until May 2008, when it determined that Rosenboom was capable of replacing HTI. Ligón and HTI argue that CNH had decided to terminate its business relationship with HTI in September 2007 and to replace it with another supplier, regardless of whether CNH knew exactly who that supplier would be or when the transition would occur. The evidence adduced at trial supports Ligón and HTI’s claim.
*1205 The fact that CNH had, in September 2007, made a definitive decision to replace HTI cannot seriously be disputed, although CNH and its executives have tried ably to do so both at trial and in CNH’s brief to this Court. However, the fact that CNH did not know at the time its decision to replace HTI was made which of its potential replacements for HTI would ultimately be selected or the exact date the transition would occur does not negate the fact that the final decision to replace HTI had been made. The most direct evidence of this decision was the September 2007 presentation given to CNH executives by Selvan in which he stated that CNH’s plan was to “Exit HTI 100%” and to “phase in alternate suppliers by May, 08.” Notwithstanding, this and other documentary evidence, including internal CNH e-mails, no less than three CNH employees attempted at trial to downplay the finality of the September 2007 decision to replace HTI. Each was subsequently impeached with previous deposition testimony indicating otherwise. For example, T.J. Bonfield, vice president of purchasing at CNH, testified as follows when questioned by Ligón and HTI’s attorney:
“Q. Mr. Bonfield, Ms. Canali said yesterday repeatedly when I asked her this question that this was just a plan, the re-sourcing that was happening with respect to HTI, the decision to leave HTI, that it was only a plan, it was not a decision to terminate them, it was a plan; is that right? Did you know that?
“A. Yes, I did, and that’s correct, she was accurate. It was' a plan to leave HTI. Any time there’s a re-sourcing plan with a supplier, you’re unable to execute that plan until all of the development, all of the testing, all of the work to qualify the new supplier has been completed. Until May or June of 2008, we were not in that position.
“Q. That’s not really true, is it, Mr. Bonfield?
“A. Yes, it is true.
“Q. What’s true, in fact, is that you had made the decision prior to September of 2007, you made the decision to terminate HTI and you made the decision to replace HTI with other suppliers, you had made that decision, and that’s a fact, isn’t it?
“A. No, it’s not. We made a decision to execute and go forward -with the resourcing plan. We also worked very hard with HTI to try to improve their situation and improve their performance to CNH. Any time you try to execute a re-sourcing plan, there’s a risk that re-sourcing plan will not execute, will not work and you don’t have a chance and you’re not able to move to the new supplier, so we had to work on both avenues, try to fix HTI and try to re-source the business. Yes, we took a decision to try to re-source the business, but it was not a decision we could formally take and execute until we could have all of the testing done, all of that work done with the new suppliers.
“Q. ... I’m going to hand you what I’ve marked as your depositions that we took in this case, one from 2009 and one from 2011_[After the witness positively identified the depositions:] Look with me at page 57 [of the 2009 deposition], if you would, starting in line 5. I asked you this question: ‘Well the truth was that you were going to re-source the business? You were going to terminate them in May of 2008, right?’ Your answer— read what you said. What was your answer?
“A. ‘That was the decision that we took.’
*1206 “Q. Then I asked you, ‘That’s the truth? That’s the decision that you made, right?’ What was your answer?
“A. I said, ‘That’s a fact.’
“Q. Look with me at the next page, if you would, page 58, line 13. I said: ‘Well, the truth was, you were going to move the business and you never told them that; isn’t that right?’ Your answer: ‘The decision was we were going to move the business.’ My question: ‘That wasn’t the truth?’ Your answer: ‘Our decision was to move the business from HTI.’ Did I read that correctly?
“A. Yes, you did.
“Q. And that was your testimony in 2009, wasn’t it?
“A. Yes, it was.
“Q. Let me ask you this, Mr. Bonfield. Ms. Canali testified yesterday, Mr. Selvan also testified that if the new HTI had improved — and when I say the new HTI, do you know what I mean by new HTI?
“A. Yes, after the purchase by Ligón.
“Q. Yes, sir. If the new HTI had improved after that point in time, if they had been able to improve on the issues that they were having — performance issues with before when it was old HTI — could they have saved the business they testified absolutely, we wanted to improve and they could have saved the business. We wanted them to be able to save the business. You’d say the same thing, right?
“A. Yes, I would. That was a possibility. In my opinion, given what I saw at HTI, given the lack of management, the history of poor quality, the history of poor delivery and all of the other issues in the business, I think it was probably not likely, but I think there was an opportunity if they had gone in there and really fixed the business, made substantial improvements, and we had issues trying to qualify new suppliers, certainly there was a chance they could have maintained the business. Unfortunately, new HTI did not make that kind of progress.
“Q. But what Ms. Canali testified to and Mr. Selvan testified to and what you just testified to under oath is not actually true, is it, Mr. Bonfield?
“A. Yes, it is true.
“Q. Look with me, if you would, at your deposition again, Mr. Bonfield.
“A. I’m sorry, which one?
“Q. Your 2009 deposition, page 66, please. Are you with me?
“A. Yes.
“Q. On line 15, I asked you this question: ‘No part of the plan at CNH was to try and allow HTI, the new HTI to correct the problems the old HTI was having and continue as a supplier.’ That was not any part of the plan was it? What did you answer me, Mr. Bonfield?
“A. At this point in the deposition, I said—
“Q. Mr. Bonfield, just what was your answer?
“A. On line 20, I said, ‘No, it was not.’
“Q. I asked you on page 68 at the top of page 68, the question was: ‘That’s not what I’m talking about, Mr. Bon-field. You know that’s not what I’m talking about. From August of ’07 when Ligón became involved and there was a new HTI, from that point on, part of the plan was never that HTI would somehow get back up to speed and continue as a supplier. That wasn’t part of your plan, right?’ And your answer was: Yeah, we *1207 made the decision to re-source.’ Did I read that correctly?
“A. Yes, you did.”
Our standard of review requires us to view the evidence in the light most favorable to Ligón and HTI and to entertain such reasonable inferences as the jury would have been free to draw. Waddell & Reed, 875 So.2d at 1152. Flint Construction Co. v. Hall, 904 So.2d 236, 250 (Ala.2004), further instructs us that “a jury concluding that any witness was willfully not truthful about one material aspect of his or her testimony is free to disregard all or any part of the testimony.” Thus, there is ample evidence indicating that by September 2007 CNH had made its final decision and formulated and implemented a plan to replace HTI with a new supplier by May'2008. That evidence is only confirmed by the additional evidence indicating that, in fact, this plan succeeded: in May 2008, CNH notified HTI that it was being replaced by Rosenboom, which CNH had been working with to replace HTI since at least August 2007. There is likewise ample evidence, which CNH does not dispute, that CNH intentionally acted to conceal its plan from Ligón and HTI. Thus, Ligón and HTI produced substantial evidence establishing the second element of their fraudulent-suppression claims, that CNH concealed or failed to disclose material facts — namely that it had decided by September 2007 to replace HTI as a supplier.
The final two elements of a fraudulent-suppression claim concern whether a plaintiff was induced to act to its injury by the defendant’s suppression of material facts. Although it is a question of law whether a party has a duty to disclose material facts, Freightliner, 932 So.2d at 891, whether a party was induced to act to its injury because material facts were concealed is a question of fact for the jury. State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 841-42 (Ala.1998). Accordingly, we do not review this element de novo; rather, we must consider only whether the jury had before it substantial evidence, that is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer,” that Ligón and HTI were induced to act to their detriment based on CNH’s mohths-long concealment of the fact that it had, by September 2007, made a final decision to replace HTI as a supplier. West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Certainly, such evidence was adduced at trial; indeed, much of it came from CNH sources.
Although CNH argues that Ligón and HTI did not put forth substantial evidence of these elements, its argument is undercut by its own theory of the case. CNH acknowledges that it kept its decision to terminate its relatiohship with HTI from Ligón and HTI for months, which begs the question, why did it do so? The answer is readily discernible from the evidence — because CNH knew that if Ligón and HTI became aware of that decision they would act differently. Ligón and HTI summarize some of the evidence indicating as much in their brief to this Court:
“In September 2007, CNH’s executive management gathered to decide whether to communicate its resourcing decision to HTI. In a presentation prepared by Selvan, the CNH management team carefully considered the pros and cons of telling the truth or deceiving Ligon/HTI: (1) ‘OPTION 1 — Tell HTI NOW that we are going to resource the business’ and (2) ‘OPTION 2 — Do not tell HTI about resourcing and hope they do not learn about it either!’ One of the factors CNH expressly considered was HTI’s purchase of supplies based on CNH’s forecasts. CNH observed that if it told *1208 HTI about its plan, ‘HTI may not hold CNH completely responsible for the tons of material they have covered for CNH future orders.’ The presentation acknowledged that HTI was ‘currently air freighting tons of parts from China at [HTI] expense’ and that if HTI learned that it was being phased out, HTI would ‘no longer expedite any components in shortage.’ The presentation also noted that if CNH did not tell HTI and Ligón about the resourcing decision ‘NOW,’ when HTI ultimately learned of CNH’s decision, HTI ‘might/will ask us to cover for materials that they have purchased for CNH and this could run into several months worth.’ ”
Ligón and HTI’s brief, pp. 7-8 (citations and emphasis omitted). Moreover, when CNH’s employee Canali was specifically asked at trial if “one of the reasons [CNH] did not tell [HTI] about the resourcing is because [CNH] needed to induce [HTI] to continue to make the cylinders,” she responded affirmatively. Finally, CNH’s concern that HTI might have acted differently during the period between when CNH decided to replace it as a supplier and when HTI was told of that decision was not unfounded, because HTI confirmed at trial that it would in fact have acted differently had it known. Campbell testified that had HTI known of CNH’s decision to terminate its relationship with HTI, “[w]e’d have made totally different plans going forward. We would not have ordered the raw materials and the goods. We wouldn’t have ordered the machinery for multiple million dollars, and we would have had time to backfill that business that was going to be pulled away.”
CNH nevertheless argues that, even if there is evidence indicating that Ligón and HTI were induced to act based on CNH’s suppression of material facts, it was not reasonable for them to do so. CNH emphasizes that HTI knew and understood that CNH had no commitment to buy any particular volume of materials from HTI or to continue to use HTI as a supplier for any length of time. However, it bears repeating here that Ligon’s and HTI’s fraudulent-suppression claims are not an argument that CNH breached an agreement to continue using HTI as a supplier for a defined length of time; it is undisputed at this point that there was no such agreement. Rather, the fraudulent-suppression claims are premised on the fact that, in September 2007, CNH decided to terminate HTI as a supplier, and it actively concealed that decision from Ligón and HTI in order to induce them to continue to act in a matter benefiting CNH. It was not merely suppression of the fact that CNH might replace HTI — Ligón and HTI acknowledge that that was always a possibility — it was suppression of the fact that CNH had already decided to replace HTI and there was nothing Ligón and HTI could do to alter that decision.
Thus, there was evidence indicating that CNH knew that disclosure of the decision to terminate HTI as a supplier would cause Ligón and HTI to act differently toward CNH than it always had and evidence indicating that Ligón and HTI did in fact take certain actions because that decision was concealed from them. Quite simply, Ligón and HTI’s decision to invest millions of dollars in their relationship with CNH would not have occurred had they known that CNH had already decided to terminate that relationship. Moreover, there was evidence presented from which the jury could have concluded that Ligón and HTI’s decision to invest that money was reasonable in light of the fact that, CNH had told them that “CNH needed [HTI] in the short term and long term” and that “we are committed” in response to questions about the future of their busi *1209 ness relationship, as well as the fact that CNH submitted approximately one-year forecasts listing projected orders to HTI using the CSCN up until the time HTI was told it was being replaced in May 2008. CNH even emphasized the importance of HTI’s being able to meet those forecasts when asked by Campbell “[w]here does CNH lie?” even though CNH had already made the internal decision that HTI would not be used to fill those orders.[3]
In conclusion, there was substantial evidence adduced at trial to support the following findings of fact: (1) Based either on Campbell’s reasonably specific questions regarding the future of HTI’s relationship with CNH or CNH representatives’ own voluntary statements regarding that future, CNH had a duty to disclose that it had made a decision in September 2007 to terminate HTI as a CNH supplier; (2) CNH instead deliberately chose to conceal that material fact from Ligón and HTI; (3) the concealment of the decision to terminate HTI as a supplier induced Ligón and HTI to take certain actions; and (4) taking those actions damaged Ligón and HTI. Because all the elements of a fraudulent-suppression claim were established, the trial court did not err in denying CNH’s motion for a judgment as a matter of law.
III.
We next consider CNH’s argument that the trial court exceeded its discretion by failing to grant CNH’s motion for a new trial. “The decision whether to grant or to deny a motion for a new trial rests within the sound discretion of the trial court.” CSX Transp., Inc. v. Miller, 46 So.3d 434, 446 (Ala.2010) (citing Jordan v. Calloway, 7 So.3d 310, 313 (Ala.2008)). CNH argues that it is entitled to a new trial because, it argues, a charge given the jury misstated the law.
“The standard for reviewing a trial court’s charge to the jury is as follows:
“ ‘ “In a jury case, a party is entitled to have its case tried to a jury that is given the appropriate standard by which to reach its decision, and a wrongful refusal of a requested jury charge constitutes a ground for a new trial. See, C.I.T. Financial Services, Inc. v. Bowler, 537 So.2d 4 (Ala.1988). An incorrect, misleading, erroneous, or prejudicial charge may form the basis for granting a new trial. See, Nunn v. Whitworth, 545 So.2d 766 (Ala.1989). However, the refusal of a requested, written instruction, although a correct statement of the law, is not cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the trial court’s oral charge. See, Rule 51, Ala. R. Civ. P. When examining a charge asserted to be erroneous, this Court looks to the entirety of the charge to see if there is reversible error. See, Grayco Resources, Inc. v. Poole, 500 So.2d 1030 (Ala.1986).” ’
“Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319, 327 (Ala.2000) (quoting Shoals Ford, Inc. v. Clardy, 588 So.2d *1210 879, 883 (Ala.1991)). Additionally, ‘[a]ny error or defect which does not affect the substantial rights of the parties may be disregarded.’ Bishop v. State Auto. Mut. Ins. Co., 600 So.2d 262, 265 (Ala.Civ.App.1991) (citing Rule 61, Ala. R. Civ. P.). As a result, the jury instruction must be erroneous as well as prejudicial, and this Court cannot presume prejudice. Brabner v. Canton, 611 So.2d 1016, 1018 (Ala.1992); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991). The appellant has the burden of demonstrating that an erroneous jury instruction was prejudicial. See Ryan, 589 So.2d at 167 (citing Dinmark v. Farrier, 510 So.2d 819 (Ala.1987)).”
Southeast Envt’l Infrastructure, L.L.C. v. Rivers, 12 So.3d 32, 43-44 (Ala.2008). CNH argues that the trial court erred by giving the jury the following charge regarding CNH’s duty to disclose:
“In deciding whether the defendant [CNH] was under an obligation to make known the important fact, you can consider the party’s intelligence, educational background, experience, knowledge and power and whether the defendant [CNH] had knowledge, power, or experience not shared by the plaintiffs Ligón or HTI. You may also consider that the transaction made the basis of this complaint is a commercial transaction. A commercial transaction is one involving the parties to arm’s length negotiations. The parties have no general obligation to disclose, but each has an affirmative duty to respond truthfully and accurately to direct questions posed by the other.”
(Emphasis added.) CNH objects to the emphasized portion of the charge, arguing that it is an incorrect statement of law. Because this was a commercial transaction involving arm’s length negotiations, CNH argues, the parties’ respective intelligence, education, experience, knowledge, and power are irrelevant; all parties are presumed to be sophisticated. Ligón and HTI argue that the instruction was correct, that the emphasized portion was taken from the Alabama Pattern Jury Instructions, that CNH previously waived any objection, and that, even if the charge was lacking in some way, CNH has merely made a bare allegation of prejudice without establishing that it was indeed prejudiced by the charge.
We agree that any error in the charge did not prejudice CNH. The challenged jury instruction concerned whether CNH had a duty to disclose. “ ‘ “The question whether a party had a duty to disclose is a question of law to be determined by the trial court.” ’ ” Freightliner, 932 So.2d at 891 (quoting Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So.2d 665, 676-77 (Ala.2001), quoting in turn Barnett v. Funding Plus of America, Inc., 740 So.2d 1069, 1074 (Ala.1999)). As we have already explained supra, under Freightliner CNH had a duty to disclose. Therefore, the only parties that might have been prejudiced by the challenged instruction are Ligón and HTI, because the challenged instruction implies that the jury could have found that CNH did not owe a duty to disclose and accordingly returned a verdict in favor of CNH on the fraudulent-suppression claims, notwithstanding the fact that determining whether there was a duty was a question of law for the trial court, which answered the question in the affirmative when it denied CNH’s motions for a judgment as a matter of law. CNH is not entitled to a new trial on this basis.
IV.
Having established that the verdict in favor of Ligón and HTI should stand and that no new trial is warranted, it is heces- *1211 sary to consider CNH’s final argument that the punitive-damages award should be remitted to $0. We described the considerations that guide our review of a punitive-damages award as follows in Ross v. Rosen-Rager, 67 So.3d 29, 41-42 (Ala.2010):
“This Court has a duty to conduct a de novo review of a punitive-damages award. Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001)....
“In reviewing a punitive-damages award, we apply the factors set forth in Green Oil [Co. v. Hornsby, 539 So.2d 218 (Ala.1989) ], within the framework of the ‘guideposts’ set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). See AutoZone, Inc. v. Leonard, 812 So.2d 1179, 1187 (Ala.2001) (Green Oil factors remain valid after Gore).
“The Gore guideposts are: ‘(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.’ Campbell, 538 U.S. at 418, 123 S.Ct. 1513. The Green Oil factors, which are similar, and auxiliary in many respects, to the Gore guideposts, are:
“‘(1) the reprehensibility of [the defendant’s] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant’s] conduct; (3) [the defendant’s] profit from [its] misconduct; (4) [the defendant’s] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.’
“Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala.2003) (paraphrasing the Green Oil factors).”
In making its argument that the punitive-damages award should be remitted, CNH does not address all the factors identified in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). Our discussion of CNH’s argument accordingly focuses on those factors identified by CNH as supporting its argument; nevertheless, our conclusion that no remittitur is warranted is ultimately based upon a review of all the relevant factors.
CNH first argues that no punitive damages are warranted because, it argues, Alabama has no interest in punishing CNH, an Illinois corporation, for harm caused to HTI, an Ohio company. In support of this argument, CNH relies on the following excerpt from Gore:
“[T]he economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State’s interest in protecting its own consumers and its own economy. Alabama may insist that BMW adhere to a particular displosure policy in that State. Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents.”
517 U.S. at 572-73. However, this argument presumes that Ligón, a Birmingham-based company, was not damaged by *1212 CNH’s conduct. As discussed supra, CNH failed to distinguish between Ligón and HTI when moving for a judgment as a matter of law at trial, thus waiving the argument that the jury’s verdict was improper as to Ligón. Moreover, the trial court, in its order denying CNH’s post-judgment motions, specifically explained the damage suffered by Ligón as a result of CNH’s suppression, explaining that, based on that suppression, “Ligón embarked upon a course of action, namely, committing its financial resources to the HTI plant to service [CNH’s] production needs while subordinating all other strategies.” The punitive-damages award accordingly has a nexus to harm suffered by an Alabama entity, and Alabama therefore has an interest in punishing the entity that caused that harm, CNH.
CNH next argues that, even if Ligón and HTI proved their fraudulent-suppression claims by substantial evidence, they failed to prove their claims by clear and convincing evidence, thus precluding an award of punitive damages. See § 6-ll-20(a), Ala.Code 1975 (“Punitive damages may not be awarded in any civil action ... other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in ... fraud ... with regard to the plaintiff.”); and § 6-11-20(b)(4), Ala.Code 1975 (defining “clear and convincing evidence” as “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion” and further noting that “[p]roof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt”). We disagree. As the evidence recited in this opinion indicates, .CNH orchestrated and carried out a months-long scheme to fraudulently suppress information from Ligón and HTI. Ample evidence of this “plan of trickery and deceit,” as the trial court referred to the scheme in its postjudgment order, was adduced at trial and is contained in the record so as to constitute “clear and convincing evidence.”
CNH next argues that the punitive-damages award should be remitted because, it argues, the award is arbitrary and amounts to a windfall for Ligón and HTI. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (“The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.” (citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), and Gore, 517 U.S. at 562)). CNH’s argument on this point is premised on the fact that Ligón elected not to have HTI assume Hydraulic’s contract with CNH at the time HTI purchased Hydraulic’s assets. CNH alleges that that contract would have required CNH to give HTI 180 days’ notice before terminating their relationship and that, if CNH breached that contract, Ligón and HTI would have been able to seek only compensatory damages, not punitive damages. See John Deere Indus. Equip. Co., 431 So.2d 1155, 1157 (Ala.1983) (“Punitive damages are generally not allowed in actions for breach of contract.”). Thus, CNH reasons, Ligón and HTI are receiving a windfall as a result of their own decision to reject a contract they could have assumed that would have protected them.[4]
*1213 However, CNH’s argument that Ligón and HTI could have avoided a situation where their relationship with CNH was terminated without notice is not supported by the facts in record. The contract HTI declined to assume provided as follows:
“If, in CNH’s reasonable judgment, [Hydraulic] does not maintain performance in line with CNH requirements, CNH may terminate this agreement in which CNH shall have no liability to [Hydraulic]. CNH must provide [Hydraulic] a written notice of its intention to terminate with a termination date not less than one hundred-eighty (180) days after the date of this notice.”
However, by its terms, this contract expired on December 31, 2007; thus, CNH could have terminated its relationship with HTI without notice at any time after that date regardless of whether the contract was assumed. CNH alleges that if HTI assumed this contract, CNH would have had to provide HTI with notice of its May 30, 2008, termination on December 2, 2007; however, no language in the contract imposed such a burden upon CNH. Rather, the language of the contract unambiguously states that the contractual term ends on December 31, 2007, and the parties’ obligations to each other under that contract, barring some clear language to the contrary, expired on that date.
Moreover, CNH’s windfall argument is further undercut by the evidence in the record indicating that HTI did, in fact, thereafter seek a contract with CNH, but its request was denied when Campbell was told by Canali that CNH was not interested in entering into a contract. CNH’s lack of interest in entéring into a contract with HTI is consistent with the jury’s implicit finding that CNH had already decided to terminate its relationship with HTI at the time of the request and was in the midst of suppressing that information from Ligón and HTI. We are not persuaded by CNH’s argument that the punitive-damages award entered on the jury’s verdict amounts to a windfall for Ligón and HTI that is prohibited by the Fourteenth Amendment’s bar on arbitrary punishments.
CNH next argues that no punitive damages are warranted because, it claims, its conduct was not reprehensible. See Gore, 517 U.S. at 575 (“Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.”). CNH argues that its course of conduct was standard business procedure and that it could not have known that it owed Ligón and/or HTI a duty to disclose until the jury returned a verdict. Compensatory damages are sufficient in this case, CNH argues, because such damages make Ligón and HTI whole while making it clear to CNH what its duties will be in similar situations going forward.
Ligón and HTI argue that CNH’s conduct was, in fact, reprehensible, in light of the breadth and duration of the plan to conceal information from Ligón and HTI, while knowing that HTI would ultimately be stuck with millions of dollars worth of raw materials that were essentially worthless if CNH no longer purchased the hydraulic cylinders for which those raw materials were ordered. In considering- the reprehensibility of CNH’s conduct for the *1214 purpose of reviewing the punitive-damages award, the trial court recited the evidence and concluded:
“Considering that there was no personal injury or exposure to any person to personal injury, the maximum amount [of punitive damages] allowed by § 6-11-21, Ala.Code 1975, is not warranted in this case nor was such an amount awarded.[5] However, the duration of the suppression combined with an active appreciation from the start of the damage the resourcing strategy would have on plaintiff coupled with the decision to go forward with the .plan of trickery and deceit practiced on plaintiff through false responses to questions posed coupled with weekly reinforcements of the suppressed facts contained in orders for cylinders provided by [CNH] to plaintiff through its CSCN system is evidence, the court finds, that supports a degree of reprehensibility in [CNH’s] conduct for which the jury rendered a reasonable amount of punitive damages.”
We agree; although the level of reprehensibility of CNH’s actions may be mitigated by certain factors, the punitive damages awarded by the jury are reasonable in light of the totality of the evidence.
CNH next argues that punitive damages should not be awarded because Alabama has no interest in discouraging confidentiality in commercial dealings. CNH articulates this argument as follows in its brief:
“As this Court reaffirmed in Freight-liner, Alabama’s fundamental policy is to permit businesses to keep internal information confidential. Freightliner, 932 So.2d at 892. This policy acknowledges that companies must keep a tremendous amount of information confidential and could not compete if they did not. Any legal scheme that requires businesses to disclose information requires them to judge when they must disclose, a judgment often made difficult by the risks inherent in disclosing internal information. Alabama has no interest in punishing businesses for making close calls incorrectly, especially where the only potential harm is economic and that harm could have been eliminated or mitigated by due diligence or contract terms. That kind of punishment would have a chilling effect on businesses’ desire to operate in the state.”
CNH’s brief, pp. 68-69. CNH is correct that Freightliner stands for the general principle that businesses are permitted to keep internal operating information confidential. However, that principle is not absolute. The touchstone of the rule applied in Freightliner is that. businesses need to be honest in their transactions; thus, the requirement that businesses respond truthfully to a specific request for information, as well as the additional requirement that any disclosure, whether prompted by a question or not, contain “those facts that are material to the ones already stated so as to make them truthful.” 932 So.2d at 894. When that rule is violated and a business chooses trickery and deceit as opposed to the honest disclo *1215 sure required by § 6-5-102 and by Freightliner, that business has committed a species of fraud, which Alabama clearly has an interest in discouraging, notwithstanding the simultaneous interest in allowing that business to keep its internal operating information confidential. See § 6 — 11—20(a) (authorizing punitive damages where there is clear and convincing evidence of fraud).
CNH’s final argument is that it did not profit from its misconduct, which factor weighs against the imposition of punitive damages. Green Oil, 539 So.2d at 223. At most, CNH argues, its decision not to tell Ligón and HTI until May 2008 that the decision had been made to terminate HTI as a supplier merely preserved the status quo, because HTI did not have an opportunity to raise its prices or to pass additional costs on to CNH during the approximately nine-month interval during which it was unaware of that decision. Ligón and HTI dispute CNH’s characterization of this factor and argue that CNH’s fraud in fact resulted in a significant amount of profit for CNH.
The trial court essentially agreed with CNH, noting that the evidence indicated that CNH recognized it might eventually “be called upon to answer in damages for plaintiffs economic losses” and that CNH therefore was attempting merely to defer those costs rather than absolutely avoid them. However, even so, CNH had the use of those funds for some time and presumably benefited from them during that period. See National Ins. Ass’n v. Sockwell, 829 So.2d 111, 139 (Ala.2002) (“National contends that it has not profited from its misconduct because, it argues, it ultimately paid Soekwell the $40,000 UIM benefits that prompted this action. However, as the trial court noted in its posttrial order, National had use of the policy proceeds from September 1998 until April 2000, when Sockwell’s claim was eventually paid. During that approximately 17 month period, National benefitted financially from having possession of the policy proceeds through earnings, interest, or through some other form of financial benefit. The exact amount of this profit or gain is unknown.”). As in Soekwell, we conclude that “[w]hether [CNH] has profited from [its] conduct is unknown”; accordingly, this factor neither supports the punitive-damages award nor supports a re-mittitur of that award. However, considering all the Gore guideposts and Green Oil factors, we conclude that no remittitur is needed and that the punitive-damages award returned by the jury is appropriate and does not infringe upon CNH’s due-process rights.
V.
Ligón and HTI sued CNH, asserting breach-of-contract, fraudulent-misrepresentation, and fraudulent-suppression claims after CNH terminated its relationship with HTI, which had previously supplied it with hydraulic cylinders. Following a jury trial, the jury returned a verdict in favor of Ligón and HTI on their fraudulent-suppression claims, awarding them $3.8 million in compensatory damages and $7.6 million in punitive damages. The trial court thereafter entered a judgment consistent with that verdict, and, for all the reasons discussed herein, that judgment is now affirmed.
AFFIRMED.
MOORE, C.J., and BOLIN, PARKER, MAIN, and WISE, JJ., concur.
SHAW and BRYAN, JJ., dissent.

. That contract was set to expire December 31, 2007.

. Of course, it seems apparent from the verdict it returned that the jury did not share CNH’s interpretation of these terms. In any event, the active concealment and carefully worded answers by CNH employees in this case are in stark contrast to the facts in Freightliner, where it is undisputed that none of the individuals responding to questions had any knowledge of the allegedly suppressed information. 932 So.2d at 890.

. CNH emphasizes that its forecasts always included a disclaimer indicating that they were not binding. However, we must view the evidence in the. light most favorable to Ligón and HTI and entertain such reasonable inferences as the jury would have been free to draw. Waddell & Reed, 875 So.2d at 1152. The jury certainly could have concluded that Ligón and HTI reasonably understood the forecasts to be good-faith estimates of future orders, subject to change based on CNH’s customer requirements — not false projections CNH had no intention of using HTI to fill. Although the disclaimer on the forecasts might defeat a breach-of-contract claim, Li-gón and HTI are not arguing breach of contract here.

. Hyundai Motor Manufacturing Alabama, LLC, makes a similar argument in the amicus brief it has filed with this Court, arguing that "[i]f a punitive award were allowed to stand in this case, commercial parties without contracts would have greater rights and more potential upside in litigation than parties who reduce their respective obligations to writing." Hyundai’s brief, p. 17.

. Section 6-11-21(a) provides generally that “no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater.” The punitive damages awarded in this case — $7.6 million — are two times the compensatory damages — $3.8 million. “[W]e have previously held that a single-digit multiplier of punitive damages to compensatory damages is constitutionally permitted in most instances.” Flint Constr. Co., 904 So.2d at 254 (citing Orkin Exterminating Co. v. Jeter, 832 So.2d 25 (Ala.2001)). CNH has also conceded that this punitive-damages award will have no real impact on its overall financial position.